Filed 3/17/14  P. v. Kyle CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DONTA KYLE,<br><br>Defendant and Appellant. | B244023<br><br>(Los Angeles County<br>Super. Ct. No. TA122773) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Patrick Connolly, Judge.  Affirmed.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi, and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

An information filed by the Los Angeles District Attorney's Office charged defendant and appellant Donta Kyle with attempted murder (Pen. Code, §§ 664, 187, subd. (a), count 1),[1] shooting at an inhabited dwelling (§ 246, subd. (a), count 2), and first degree murder (§ 187, subd. (a), count 3). As to all counts, it was alleged that appellant personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c), and (d)), and that the crimes were committed for the benefit of a criminal street gang, within the meaning of section 186.22, subdivision (b). As to all counts, it was further alleged that appellant suffered prior convictions of a serious or violent felony (§§ 1170.12, subds. (a)-(d); 667, subds (a)(1), (b)-(i); 667.5, subd (b)). Appellant pleaded not guilty and denied the allegations.

A jury found appellant guilty of shooting into an inhabited building (count 2), and murder in the first degree (count 3). The firearm and gang allegations were found to be true. Appellant was found not guilty of attempted murder (count 1). During a bifurcated proceeding, the trial court found the prior strike allegation to be true.

The trial court sentenced appellant to a total term of 135 years to life in prison, comprised of 50 years to life, plus 25 years for the gun-use enhancement on count 3, 30 years to life, plus 25 years for the gun-use enhancement on count 2, plus a consecutive five-year term for the prior prison term allegation. The trial court ordered appellant to pay $5,250.62 in victim restitution, and he was awarded 161 days of custody credit.

Appellant contends the trial court erred when it (1) allowed the People's gang expert to express opinions based on testimonial hearsay, (2) failed to instruct the jury on the lesser included offense of voluntary manslaughter based on provocation or heat of passion, or on imperfect self-defense, and (3) denied him due process because the victim restitution award was punitive in nature.

We affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

### A.     Shooting at an Inhabited Dwelling (Count 2)

Leon Moore lived in a transitional housing facility.  Sometime in December 2011, Moore won "a pretty reasonable amount" of money from gambling.  Appellant, armed with a shotgun, came to Moore's apartment and demanded money.  Moore walked to another room, locked the door, and waited there until appellant left.  Moore called Antion West and told him what appellant had done.  West, whose street moniker was "Little Noonie" was a high ranking member of the 11 Deuce Broadway Gangster Crips (BGC).  West assured Moore that he would talk to appellant to make sure it would not happen again.

On February 8, 2012, appellant came to Moore's apartment looking for Moore's roommate.  Moore refused to open the security screen door.  Appellant had nothing in his left hand but his right hand was above his head over the doorjamb and Moore could not see it.  Moore turned to walk away.  Appellant threatened him "on Broadway Crip" to open the door or he would shoot him.  Appellant shot through the door and the bullet penetrated through the wall of the apartment and hit Moore in the shoulder.  Moore's girlfriend, Doris Williams, was in the apartment at the time of the shooting and heard appellant swear "on Broadway" that he was going to shoot Moore.  Moore was transported to a hospital and treated for a gunshot wound.

### B.     The Murder of Antion West (Count 3)

On February 26, 2012, West called his girlfriend Anecia George and told her he had gotten into an argument and shot and killed a man.  The victim was later identified as Curtis Sproull who was also known as "Rat Capone" and was a "main player" in the Main Street Mafia Crips (MSMC).  In March 2012, George stayed in Room 107 of the Economy Motel and she and West saw each other every day.  Appellant and West were "around each other a lot" during this time.

On March 4, 2012, Starletta Coffee stayed in Room 201 of the Economy Motel.

3

Appellant and two other males came to her room during the day.  Appellant carried a gun which Coffee believed was either a "nine or a four-five."  Appellant's cell phone was not operable and he borrowed a cell phone from West's nephew, "Baby Noon."  Appellant called West a number of times during the day and discussed plans to go to an after-hours club.  Shortly before 8:00 p.m. West pulled up to the motel and honked.  West was driving a black rental car.  Appellant left with West.

Shortly before midnight, West picked up George at the motel and they drank some alcohol and drove around for a while.  At one point West drove to his apartment to retrieve his gun but on returning to the car told George, "Fuck that shit.  I don't need that.  I'm good."  West received a call on his cell phone and returned to the motel and dropped off George.  Security video from the motel showed George being dropped off by West.  George saw appellant get into West's silver Dodge Charger and leave the parking lot of the motel.  George was upset that appellant left her and had a drink.  When she went outside she realized she had left her wallet in West's car and began calling and texting him repeatedly.  She also called appellant's phone because he was with West.  Neither one responded to George.  George's cellular phone records indicated the first text message was sent at 12:36 a.m. on March 5, 2012.

George continued to call West and then began walking around the area near the motel looking for him.  She ran into appellant walking on the street.  Appellant was "very sweaty and he looked like he saw a ghost or something."  Appellant returned to the Economy Motel and spoke to an MSMC gang member who was staying in Room 202, next door to Coffee.  The MSMC gang member packed up his stuff and left the motel.

Antonio Vergara lived on South Spring Street in the City of Los Angeles.  At 12:35 a.m. on March 5, he was awakened by the sound of approximately four or five gunshots.  As he walked to the bathroom, he heard some more gunshots.  Los Angeles Police Department (LAPD) Officer Andrew Jenkins and his partner were in the neighborhood and drove toward the sound of the gunshots.  They found a parked silver Dodge Charger.  The driver's side windows were shattered and the passenger door was

4

wide open. West was sitting in the driver's seat. His head was slumped down and he had a cell phone in his hand. He was not breathing and had bullet wounds to the neck, chest, and shoulder areas. West sustained nine gunshot wounds, seven of which were fatal.

LAPD Detective Charles Hicks arrived at the crime scene and observed a number of bullet casings from a ten-millimeter handgun and a .45-caliber handgun close to the Dodge Charger. A cell phone recovered from the car was later determined to belong to West. Detective Hicks obtained a log of all text messages, calls, and tower locations associated with the cell phone. Detective Hicks said that driving "between 25 and 30 miles an hour" it took "approximately one minute" to drive from the location where West's body was found to the Economy Motel.

After the murder, appellant showed his sister Shatera Neal, a ten-millimeter handgun that he said belonged to him. He told her that West had asked him to participate in a shooting of a location frequented by other BGC gang members. Appellant told her he did not want to do it and asked West to stop the car so that he could use the bathroom. Appellant got out of the car and walked around to the driver's side and shot West. He told Neal he shot West "like boom-boom-boom" and then took off. Appellant bragged about the shooting and told others including Neal's cousin that he shot West.

### Gang Expert Testimony

LAPD Detective Patrick Flaherty, a gang expert, provided lengthy testimony in support of the gang allegations accompanying the charges against appellant. He received general gang training at the LAPD academy and from the Los Angeles County Sheriff's Department and had worked primarily in gang units since 1995. He was familiar with various different gangs and had previously testified as an expert on the BGC gang. There were approximately 150 to 160 documented members of the BGC gang. Their primary criminal activities included tagging, vandalism, narcotics sales, weapons violations, shootings, assaults with deadly weapons, and attempted murder of police officers and rival gang members. The trial court admitted into evidence two certified minute orders. They showed that Akeeda Joshua (Joshua) and DeShawn Davis (Davis) were convicted

5

of predicate offenses. Joshua was convicted of assault with a firearm and possession of rock cocaine for sale in 2011, and Davis was convicted of robbery in 2011. Joshua and Davis were members of the BGC gang at the time they committed the crimes and Detective Flaherty was personally familiar with both of them.

Detective Flaherty was familiar with West and had recent contacts with him before he was killed. He arrested West on two occasions and West had been imprisoned as a result of those cases. He knew West's status in the gang was higher than the average BGC gang member and knew West to habitually carry a firearm. Detective Flaherty opined that it would be improbable that West would let himself get caught unarmed in dangerous situations involving rival gang members. Detective Flaherty was also familiar with appellant and identified him as a member of the BGC gang. He had spoken with appellant on several occasions and knew him to use the moniker "HK Pooh."

The MSMC gang was larger and better organized than BGC and had 250 to 300 members. Prior to February 2012, MSMC and BGC were allies. Problems arose between the two gangs when Curtis Sproull, a well-respected "main player" in MSMC, was killed on February 26, 2012. West was suspected of killing Sproull and MSMC would appear weak if it failed to respond to the killing. Any sign of weakness on the part of MSMC would reduce respect for the gang and reduce the gang's intimidation level in the community.

Based upon the customs of gangs, intelligence from the street, and his own experience, Detective Flaherty opined that MSMC could regain its respect by going to "war" with BGC. It would be a "bloody battle" because the two gangs shared a common border. An alternative solution would be for BGC to "clean house" internally by identifying Sproull's killer and killing him. Putting a bounty on West was another plausible way for MSMC to get back at BGC. Detective Flaherty acknowledged that he did not have any specific knowledge of the possible scenarios he had outlined involving

MSMC's retaliation. However, a text message[2] dated March 3, 2012, indicated that a real problem existed between MSMC and BGC. The text message stated that BGC gang members should be careful because MSMC gang members were "casing" BGC hangout spots.

Responding to a hypothetical question based on the facts of the shooting at an inhabited building, Detective Flaherty opined that the crime was committed for the benefit of the BGC criminal street gang because it was done to instill fear and intimidation in the community. When appellant announced his gang name and Moore refused him entry, appellant was compelled to take the action of shooting into the house to save face and preserve respect for the gang. Appellant's status and reputation within the gang were enhanced by his willingness to engage in extreme violence and enhanced the gang's reputation to maintain respect and fear in the community.

When presented with a hypothetical question based on the facts of the West murder, Detective Flaherty opined that the murder was committed for the benefit of the BGC criminal street gang. Sproull's murder caused problems between MSMC and BGC that potentially could have lead to a bloody war between former allies. West's murder enhanced the reputation of both gangs and showed the community that even when a high ranking member of a gang committed an act that could not be tolerated, he had to be sacrificed to prevent a gang war. The murder also enhanced appellant's reputation within the gang because he was now viewed as a killer.

## DISCUSSION

## I.     Gang Expert's Testimony

### A.     *Contention*

Appellant contends that he was denied his right to confrontation when the prosecutor relied on Detective Flaherty's testimony to prove motive, intent and knowledge of the West murder, and also to prove BGC's primary activities, and the predicate offenses for the gang allegation. Appellant argues that Detective Flaherty's

---

[2]     The text message was retrieved from a cell phone registered to Baby Noon.

testimony was supported only by testimonial hearsay within the meaning of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  He contends the testimony was offered for the truth of the matters therein, and he had no opportunity to confront the declarants.  The People argue that appellant forfeited his Sixth Amendment argument by failing to object below.  Appellant alternatively contends his trial counsel was ineffective for not objecting to the evidence on confrontation grounds at trial.

### B.    Applicable Law

Any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, is subject to a sentence enhancement.  (§ 186.22, subd. (b)(1).)  "The prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period.  [Citations.]"  (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*); § 186.22, subds. (e) & (f).)

It is settled that, "because the culture and habits of gangs are matters which are 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' [citation], opinion testimony from a gang expert, subject to the limitations applicable to expert testimony generally, is proper.  [Citation.]"  (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9.)  "'An expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably . . . be relied upon" for that purpose.  [Citations.]'"  (*People v. Carpenter* (1997) 15 Cal.4th 312, 403, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106-1107.)  "And because Evidence Code

8

section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.]" (*Gardeley, supra,* 14 Cal.4th at pp. 618-619.)

In *Crawford,* the court held that when nontestimonial hearsay is at issue, the confrontation clause does not bar it. Nor does the confrontation clause "bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]" (*Id.* at pp. 59-60, fn. 9.) The United States Supreme Court has interpreted *Crawford's* application to expert testimony and the information on which the testimony is based. (See, e.g. *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221, 183 L.Ed.2d 89]; *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705, 180 L.Ed.2d 610]; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.) The California Supreme Court analyzed confrontation clause issues in *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*), *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*). All three cases involved witnesses who testified about technical reports that they did not prepare. (*Lopez, supra,* 55 Cal.4th at p. 573 [a laboratory analyst testified regarding a blood-alcohol level report prepared by a colleague]; *Dungo, supra,* 55 Cal.4th at p. 612 [a pathologist testified regarding the condition of the victim's body as recorded in an autopsy report prepared by another pathologist]; *Rutterschmidt, supra,* 55 Cal.4th at p. 659 [a laboratory director testified that his analysts had detected the presence of alcohol and sedatives in the victim's blood].) The court has yet to do so with respect to the basis evidence of a gang expert whose testimony is usually based, at least in part, on his or her own experience and investigation.

In *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*), Division Two of the Fourth Appellate District considered *Crawford* in the context of a defendant's challenge to testimony by a gang expert. The defendant in *Thomas* contended that "his right to confront witnesses was violated by the admission of hearsay evidence in the form of the

gang expert's conversations with other gang members in which they identified defendant as a gang member." (*Thomas,* at p. 1208.) The appellate court observed that "[t]he rule is long established in California that experts may testify as to their opinions on relevant matters and, if questioned, may relate the information and sources on which they relied in forming those opinions. Such sources may include hearsay. (*Id.* at p. 1209, citing Evid. Code, § 801, subd. (b), and *Gardeley, supra,* 14 Cal.4th at pp. 618-619.) The appellate court reasoned that "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citation.]" (*Thomas, supra*, at p. 1210.) The appellate court ultimately concluded that, because the statements in the case before the court "were not offered to establish the truth of the matter asserted, but merely as one of the bases for an expert witness's opinion, the confrontation clause, as interpreted in *Crawford,* does not apply. There was no error in the use of the hearsay statements." (*Thomas, supra*, at p. 1210; see also *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427 (*Ramirez*) ["hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which *Crawford* condemned"]; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 154 (*Sisneros*) ["the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion"].)

### C. Analysis

Preliminarily, we agree with the Attorney General that appellant has forfeited the right to raise the issue on appeal. (Evid. Code, § 353; *People v. Tafoya* (2007) 42 Cal.4th 147, 166 [defendant's failure to raise confrontation clause claim at trial forfeits issue on

10

appeal]; see also *People v. Redd* (2010) 48 Cal.4th 691, 730 & fn. 19; *People v. Chaney* (2007) 148 Cal.App.4th 772, 779.) Appellant made no objection to Detective Flaherty's testimony on the basis of *Crawford* and the confrontation clause. Consequently, any confrontation clause claim is forfeited. In any event, we conclude that appellant's claim fails on the merits.

Appellant acknowledges that his arguments have been rejected by the California courts (*Thomas, Ramirez, and Sisneros*) but argues that they misinterpreted *Crawford*. However, the precedential value of the *Thomas* line of cases is undiminished and we reject appellant's arguments as well. Detective Flaherty offered his *opinion* that appellant had a motive to kill West and the murder benefitted appellant and the BGC and MSMC gangs. His *opinion* was based on his 17 years of experience as a gang detective and the intelligence available to him. It was not offered for the *truth* of the matter and was not subject to the limitations of *Crawford*. (*Thomas, supra,* at p. 1210.)

The truthfulness of Detective Flaherty's testimony with respect to BGC's "primary activities" was not in question here. Detective Flaherty testified regarding his training, his job responsibilities handling gang investigations, his knowledge of the gang culture including the specific signs or symbols used by the BGC, his experience having previously testified as an expert on the BGC gang, and his personal knowledge in the two predicate cases. Detective Flaherty was available to be cross-examined on any aspect of his testimony that the defense believed did not support his opinion.

Appellant contends the certified minutes orders of the convictions of Joshua and Davis were testimonial. This argument was waived because appellant did not object to the certified minute orders. (*People v. Larson* (2011) 194 Cal.App.4th 832, 837.) In any event, the minute orders were not prepared to establish or prove a fact at trial. Instead, they were prepared for the nontestimonial, administrative purpose of documenting criminal proceedings as a matter of court business and public record. (*People v. Perez* (2011) 195 Cal.App.4th 801, 803 [copies of prison packets are nontestimonial and therefore do not implicate the confrontation clause]; *Larson, supra,* 194 Cal.App.4th at

11

pp. 836-837 [certified records of prior convictions do not violate the confrontation clause].)  Consequently, we conclude that the certified minute orders did not raise confrontation clause concerns.

Appellant's alternative contention that his trial counsel was ineffective for not objecting on confrontation grounds is also rejected.  As we have explained, under the current state of the law, appellant's objection would have been futile, and it cannot be said that every reasonable attorney would have objected to Detective Flaherty's testimony on hearsay or confrontation grounds.  Defense counsel is not required to make futile objections or advance meritless arguments.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 616; see *Strickland v. Washington* (1984) 466 U.S. 668, 688 [counsel's performance must fall below an objective level of reasonableness and prejudice defendant].)

## II.     Trial Court's Refusal To Instruct The Jury on Voluntary Manslaughter

Appellant contends the trial court prejudicially erred by failing to instruct the jury on the lesser included offense of voluntary manslaughter based upon (1) provocation or heat of passion, or (2) imperfect self-defense.  Appellant maintains that the record contains sufficient evidence to justify the instructions.  We disagree. [3]

A trial court has a sua sponte duty to instruct on all lesser included offenses that find substantial support in the evidence.  (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149, 162 (*Breverman*).)  "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed.  [Citations.]" (*Ibid.*) Thus, the trial court properly refuses to instruct on a lesser included offense when

---

[3]     We note the defense that "there is no proof . . . that [appellant] was at the car, at the Charger, at the time that Little Noonie, a shot caller from Broadway Gangster Crips, was killed" effectively rejected any voluntary manslaughter theory.

there is insufficient evidence to support the instruction. (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Voluntary manslaughter is the intentional but nonmalicious killing of a human being. (§ 192; *People v. Manriquez* (2005) 37 Cal.4th 547, 583 (*Manriquez*); *People v. Benavides* (2005) 35 Cal.4th 69, 102.) Voluntary manslaughter is a lesser included offense of murder. (*Manriquez, supra,* at p. 583.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense. (*Ibid.*)

"On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1215; *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

### A.      *Heat of Passion*

"Heat of passion arises when 'at the time of the [attempted] killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201 (*Barton*).) Both sufficient provocation and heat of passion must be shown. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 (*Steele*).) The provocation must arise from the victim. (*People v. Gutierrez, supra*, 112 Cal.App.4th at p. 709.) Unless the People's evidence suggests there was provocation, the burden is on the defendant to establish sufficient evidence of provocation and heat of passion. (*People v. Rios* (2000) 23 Cal.4th 450, 460–462 (*Rios*); *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704.)

The heat of passion requirement for manslaughter contains an objective component and a subjective one. The defendant must actually and subjectively act under the heat of passion. The circumstances giving rise to the heat of passion, however, are

13

also viewed objectively, requiring that the "passion" be one that would "'naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.'" (*Steele, supra*, 27 Cal.4th at p. 1252.) No defendant can have recourse to his own standard of conduct and declare his passions were aroused; rather, the jury must believe the circumstances were sufficient to arouse the passion of a reasonable man. (*Ibid*.)

Appellant contends that there was sufficient evidence that West asked appellant to assist in the shooting of a location known to be a BGC gang hangout, and that appellant believed his cousin was present at the location. Appellant therefore contends that West's request was sufficiently provocative to enrage appellant to the point he shot West. The totality of appellant's evidence occurred when the prosecutor played Ms. Neal's interview with the police for the jury. But Ms. Neal's police interview did not provide any details as to how appellant was aware of his cousin's presence at the location. Nor was Ms. Neal questioned by appellant's counsel on this issue when she testified at trial.

Appellant argues the trial court found "a little bit of evidence" that appellant was provoked. But that misstates the trial court's finding. The trial court questioned the "level of evidence" resulting from Ms. Neal's testimony. The court stated the concept that appellant was asked to do another shooting was "vague or nebulous" because the identity of the intended victims and the reason for the alleged shooting was unknown. The evidence showed that moments before West was shot he was seen driving away from the Economy Motel with appellant. Appellant told Ms. Neal that he asked West to stop the car so that he could use the bathroom. Appellant said that he walked around the car to the driver's side and "just lit off" and shot West "boom-boom-boom." Appellant's theory was little more than speculation and he failed to carry the burden to establish sufficient evidence of provocation and heat of passion. (*Rios, supra,* 23 Cal.4th at pp. 460-462.)

In light of the absence of any evidence to support appellant's contention, we conclude that an instruction on voluntary manslaughter based on provocation or heat of

passion was not warranted, and any error in the trial court's failure to so instruct was harmless. Under the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), it is not "reasonably probable" that appellant would have obtained a more favorable outcome at trial had a heat of passion instruction been given. (*Watson, supra,* 46 Cal.2d at p. 836; see also *People v. Moye* (2009) 47 Cal.4th 537, 557–558.)

### B.    *Imperfect Self-Defense*

Unreasonable or imperfect self-defense is not an affirmative defense, but rather a shorthand description of one type of voluntary manslaughter. (*People v. Barton* (1995) 12 Cal.4th 186, 200; *People v. Cruz* (2008) 44 Cal.4th 636, 664.) Unreasonable self-defense requires the defendant to have an actual, if unreasonable, belief that he is in imminent danger to his life or of suffering great bodily injury. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) In such circumstances, the defendant is deemed to have acted without malice and cannot be convicted of murder but only of manslaughter. (*Ibid*.)

Appellant contends that there was sufficient evidence that he shot West in the unreasonable but good faith belief that he had to act in self-defense to protect himself and his cousin from imminent peril. The trial court was obligated to instruct on this doctrine if there was "evidence substantial enough to merit consideration by the jury that under this doctrine the defendant [was] guilty of voluntary manslaughter." (*People v. Michaels* (202) 28 Cal.4th 486, 529.) Conversely, there was no obligation to instruct on this doctrine if there was no substantial evidence to support it. (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) Appellant argues that if he refused to commit the shootings ordered by West, "then it is likely Mr. West would have shot or killed appellant." Even if appellant refused West's order to shoot up the BGC gang hangout the evidence here does not show that appellant believed he was in imminent danger of being killed or suffering great bodily injury and that the immediate use of deadly force was necessary to defend against the imminent danger. George testified that West did not retrieve a gun from his apartment and told her he did not need one that night. When appellant confessed to his

15

involvement in the shooting he did not tell Ms. Neal that West was armed before he shot him. Lacking any substantial evidence to the contrary, appellant failed to show that he believed he faced an imminent peril that had to be """"instantly dealt with."""" (*In re Christian S., supra,* 7 Cal.4th at p. 783, italics omitted.)

In any event, we conclude that any error in the trial court's failure to instruct on imperfect self-defense was harmless under the test of *Watson, supra,* 46 Cal.2d 818, i.e., that appellant would not have achieved a more favorable outcome had his requested instruction been given. (*People v. Blakeley* (2000) 23 Cal.4th 82, 93 [failure to instruct on imperfect self-defense is state law and subject to the harmless error test of *Watson, supra*, at p. 836].) Appellate review under *Watson* "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman, supra*, 19 Cal.4th at p. 177.)

## III.    Victim Restitution Awards

Appellant contends he had a right to a jury trial on the facts pertinent to the victim restitution orders under section 1202.4, subdivision (f). We disagree.

Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*).) The statutory maximum under *Apprendi* is the maximum sentence a judge can impose based on facts reflected in the jury verdict or admitted by the defendant. (*Blakely v. Washington* (2004) 542 U.S. 296, 303 (*Blakely*).) The *Apprendi/Blakely* rule has been extended to criminal fines. (*Southern Union Co. v. United States* (2012) 567 U.S. ___ [132 S.Ct. 2344, 2348-2349, 183 L.Ed.2d 318] (*Southern Union*); *United States v. Day* (4th Cir. 2012) 700 F.3d 713, 732 (Day).)

Lower federal courts have held that *Apprendi* does not apply to restitution orders. (*Day, supra,* 700 F.3d at p. 732; *United States v. Wolfe* (7th Cir. 2012) 701 F.3d 1206, 1217; *U.S. v. Wooten* (10th Cir. 2004) 377 F.3d 1134, 1144, fn. 1.)

The Fourth District rejected the application of *Southern Union, Apprendi* and *Blakely* to direct victim restitution in *People v. Pangan* (2013) 213 Cal.App.4th 574, 585: "[N]either *Southern Union, Apprendi* nor *Blakely* have any application to direct victim restitution, because direct victim restitution is not a criminal penalty.  As explained in *U.S. v. Behrman* (7th Cir. 2000) 235 F.3d 1049, 1054, direct victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits."  Prior to that, *People v. Millard* (2009) 175 Cal.App.4th 7, 35 held that victim restitution does not constitute increased punishment for a crime and therefore does not trigger the right to a jury trial.

Until either of the Supreme Courts directs otherwise, we follow this substantial authority.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:

_____, P. J.

BOREN

_____, J.

CHAVEZ

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17